**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| | * | |
| **CHARLES LEMUEL ARBOGAST, JR.,** ***et al.,*** | * | |
| **Plaintiffs** | * | |
| **v.** | * | **CIVIL NO. JKB-14-4049** |
| **A.W. CHESTERTON CO.** ***et al.,*** | * | |
| **Defendants** | * | |

*** * * * * * * * * * * ***

**MEMORANDUM**

Pending before the Court in this multidefendant asbestos personal-injury case is General Electric Company's ("GE") motion to exclude certain opinions and testimony of Dr. Robert Leonard Vance, who is offered by Plaintiffs as an expert on the subject of exposure to asbestos. (ECF No. 385.) The motion has been briefed (ECF Nos. 416 and 419), and no hearing is required, Local Rule 105.6 (D. Md. 2014). The motion will be granted. Also pending before the Court is GE's motion for summary judgment (ECF No. 465), which has been opposed by Plaintiffs (ECF No. 497) and for which GE has filed its reply (ECF No. 510). No hearing is necessary, and the motion will be granted.

***I. Background***

Plaintiffs, who are husband and wife Charles Lemuel Arbogast, Jr., and Barbara Arbogast, sued twenty-seven defendants—of whom fourteen remain in the case—and alleged they, as manufacturers and/or distributors of various products, caused Charles Arbogast ("Arbogast") to be exposed to asbestos, which led to his diagnosis of mesothelioma. (Compl., ECF No. 2.) Following an earlier ruling, the complaint now contains three counts, including

Count I – strict liability, Count II – negligence, and Count IV – loss of consortium. (*See* Ord., May 5, 2016, ECF No. 515.) Plaintiffs demand compensatory damages in excess of $75,000. Every allegation in the complaint is worded to apply to all of the Defendants and any of their products, operations, or processes (simply referred to as "product"); the allegations are not specific to any individual Defendant or to any specific product. Whether a particular Defendant's product or products contained asbestos and caused Arbogast to be exposed to asbestos is not detailed in the complaint; thus, in conjunction with any factual evidence, Dr. Vance's expert opinion is pivotal in the ultimate determination of whether a specific Defendant is responsible for exposing Arbogast to asbestos.

GE has advanced two arguments to exclude Dr. Vance's opinions regarding asbestos exposure caused by GE wire and GE marine turbines: First, the opinions are inadmissible under Federal Rule of Evidence 702; and second, with respect to Dr. Vance's opinion regarding asbestos exposure from GE's marine turbines, his opinion was not included in his Rule 26 disclosures and should be excluded pursuant to Federal Rule of Civil Procedure 37. A careful review of the governing authorities and the materials in the record lead this Court to conclude GE's arguments are meritorious.

Further, the Court has considered GE's motion for summary judgment in conjunction with the motion *in limine* and has found it, too, has merit. The Court's reasons follow.

## ***II. Analysis***

### ***A. Expert Disclosures***

#### ***1. Timeliness***

Taking the argument as to timeliness first, the Court notes that the scheduling order in this case, entered on February 24, 2015, set, *inter alia*, July 31, 2015, as the deadline for

Plaintiffs to produce their expert disclosures pursuant to Federal Rule of Civil Procedure 26(a); September 30, 2015, as the deadline for Plaintiffs to supplement their expert disclosures "with later acquired information" and for depositions of Plaintiffs' experts to be completed; November 20, 2015, for Defendants to provide their Rule 26(a)(2) disclosures; and January 29, 2016, as the deadline for filing dispositive motions. (ECF No. 89.) On July 30, 2015, Plaintiffs supplied to Defendants the written opinion of R. Leonard Vance, Ph.D., J.D., PE, CIH, Adjunct Associate Professor in Virginia Commonwealth University's Department of Mechanical and Nuclear Engineering. In relation to GE, Dr. Vance noted that Arbogast had said he worked with GE generators at Sparrows Point Shipyard and that he worked with GE asbestos braided wiring. "He advised me that this wiring produced visible dust when he worked with it and I hold the opinion that Mr. Arbogast was exposed to asbestos dust emanating from GE braided wiring." (Vance Op. 5, Def. GE's Mot. Ex. C.) However, Dr. Vance's opinion never mentioned GE marine turbines, which Arbogast presumably encountered at Sparrows Point Shipyard.[1]

Dr. Vance's deposition was taken on September 25, 2015, but since it did not conclude on that date, it was carried over to October 22, 2015. (Def. GE's Mot. Ex. D & E.) On the second day of testimony, Dr. Vance made clear in cross-examination that, as far as GE was concerned, the only product about which he was offering his expert opinion in connection with asbestos exposure was GE wiring. (Vance Dep. Oct. 22, 2015, 91:13-16.) After Defendants'

[1] Dr. Vance's written opinion also noted that Maurice Edward Burnham, who was a coworker of Arbogast at a predecessor of CSX Railroad, "testified he and Mr. Arbogast worked with GE, Westinghouse and GM traction motors and that work was a source of asbestos exposure to them." (*Id.* 12 (footnote omitted).) In his deposition, Dr. Vance conceded that the traction motors were "affixed to the locomotive and they provide the power to the axles to turn the wheels." (Vance Dep. Sept. 25, 2015, 72:19-25.) A prior order in this case granted partial summary judgment to GE as to "any claims based on exposure to asbestos from GE products that were an integral or essential part of locomotives while Plaintiff was employed by CSX Transportation and its predecessor, the Baltimore and Ohio Railroad Company, at the Railroad's Mount Clare facility in Baltimore, Maryland, from 1963 to 1973, including, specifically, wire and cabling, electric motors, fuel pumps, generators, *traction motors* and dynamic brake grid blower fans." (Order, Dec. 21, 2015, ECF No. 407 (emphasis added).) The consequence of this ruling was to leave in the case only Dr. Vance's expert disclosure, as to Plaintiffs' claim against GE, regarding alleged asbestos exposure caused by GE wiring.

cross-examination of Dr. Vance was concluded, Plaintiffs' counsel engaged in the following exchange with him:

> Q Okay. Now, the [General Electric] turbo generators[2] in a Merchant Marine vessel of that era, do you have an opinion as to whether they were insulated with asbestos?
>
> MR. NADOLINK: Objection. Beyond the scope of the report, and also outside the witness' expertise.
>
> A I do have an opinion, and my opinion is that they were asbestos insulated.
>
> Q All right. And if – Did you recall testimony regarding Mr. Arbogast running cables and wires to those generators?
>
> A I recall that testimony.
>
> MR. NADOLINK: Objection. Beyond the scope of the report. Beyond the scope of this witness' expertise.
>
> Q Do you have an opinion as to whether Mr. Arbogast would have been presented a risk of exposure to respirable asbestos by working in the engine room near turbo generators manufactured by GE?
>
> MR. NADOLINK: Same objection.
>
> A I do have an opinion, and my opinion is that he would have been at excess risk as a result of such an exposure.
>
> Q Are those exposures and those type exposures recognized in the industrial hygiene literature?
>
> MR. NADOLINK: Same objections.
>
> A Yes, they are.
>
> Q And are those exposures of a type discussed in the industrial hygiene literature that requires either respiratory protection or a warning sufficient for the employee to avoid exposure?
>
> MR. NADOLINK: Same objections.
>
> A Yes.

[2] Apparently, turbo generators, at the shipyard, at least, are the same as marine turbines.

(*Id.* 107:2—108:20.)

Federal Rule of Civil Procedure 26 sets forth specific requirements as to expert disclosures. Not only must the identity of any expert witness be disclosed, but also the Rule requires that

> [u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . .

Fed. R. Civ. P. 26(a)(2)(B). Pertinent to the present discussion, Rule 26(a)(2)(B)(i) requires "*a complete statement of all opinions* the witness will express and the basis and reasons for them." (Emphasis added.) Further, Rule 26 imposes a specific time for a party's expert disclosures if a scheduling order is entered: "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). In addition,

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .

Fed. R. Civ. P. 26(e)(1). Also, the rule provides,

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

As earlier noted, the deadline has passed for dispositive motions to be filed, and currently pending is GE's motion for summary judgment as to all of Plaintiffs' claims against it. The adequacy of Dr. Vance's expert disclosures bears directly on the disposition of this motion.

Exclusion of expert opinion testimony that is not properly disclosed pursuant to Rule 26 is a permissible sanction under Rule 37(c)(1):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

As the respondents to GE's motion to exclude, Plaintiffs have the burden "to show that the failure to comply was either substantially justified or harmless." *Carr v. Deeds*, 453 F.3d 593, 602 (4th Cir. 2006). Plaintiffs have offered no explanation for their failure to disclose, in accordance with the scheduling order, Dr. Vance's opinion that Arbogast's asbestos exposure was caused by GE marine turbines. In fact, they absurdly claim they actually did disclose this opinion. (Pls.' Opp'n 6-7.) But the citations they give to Dr. Vance's opinion do not support that contention. As earlier noted, as a result of the prior grant of partial summary judgment for GE, the only remaining, viable, expert opinion on GE products within Dr. Vance's written disclosure is his opinion "that Mr. Arbogast was exposed to asbestos dust emanating from GE braided wiring." (Vance Op. 5.) With no justification proffered or discernible from the record, it appears obvious that Plaintiffs' failure to disclose in a timely fashion Dr. Vance's opinion regarding asbestos exposure from GE marine turbines is unjustified.

Plaintiffs strangely try to blame Defendants for any harm emanating from Plaintiffs' failure to disclose this opinion in the manner required under the Federal Rules. They contend that "defense counsel strategically tried to evade the issue with general questions such as 'are these all your opinions about GE' or 'I don't have to go anyplace but your report' for GE

opinion. Knowing that Mr. Arbogast testified about significant work in the vicinity of GE turbines, counsel for GE chose to not cross examine on the issue of potential exposures from GE turbines until after the question was raised by Plaintiff's counsel." (Pls.' Opp'n 7.) Plaintiffs' contention is preposterous. Defendants' cross-examination of Dr. Vance was appropriately based on the contents of his Rule 26 written disclosure, *which never mentioned GE marine turbines and exposure to asbestos caused by them*. To suggest that defense counsel should have dreamed up an additional opinion for Dr. Vance's cross-examination is ludicrous. *See Carr*, 453 F.3d at 604-605 ("Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses"; "[e]very litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client"). Defense counsel's subsequent recross-examination was subject to GE's objection specifically premised in part upon the newly hatched opinion's being beyond the scope of the written report. That objection was valid.

Moreover, Plaintiffs' response to the motion, filed December 30, 2015, suggests that GE was not harmed by the belated disclosure, albeit verbally made, because it was "prior to the close of discovery, prior to the time in which defendant had to identify their experts and prior to the time for the deposition of defendants['] experts. Defendants' experts have not been deposed at this time and both defense counsel and defense experts are able to fully prepare on this issue." (*Id.* 7-8.) Plaintiffs claim that "the general purpose of Rule 37 is to prevent surprise at trial," citing *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 595, 596 n.2 (4th Cir. 2003). (*See* Pls.' Opp'n 8.) Plaintiffs' argument is an oversimplification of *Southern States*. Rule 37's sanction of exclusion is not limited to trial testimony. Rather, it specifically

permits exclusion of undisclosed information not only at trial, but also at a hearing or *on a motion*. Thus, in the present context, Rule 37 addresses nondisclosure in relation to GE's pending motion for summary judgment.

The Court finds that the informal, belated disclosure was not harmless. This is a complex case involving many parties, and the scheduling order was put in place to ensure that the litigation proceeded in an organized fashion. To that end, the discovery deadlines were steps along the path to the deadline for the filing of dispositive motions, which, in turn, depend upon a full and complete factual record being assembled in a timely fashion. *See Carr*, 453 F.3d at 604 ("A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case."). Pursuant to Rule 37, the Court concludes Plaintiffs' failure to make proper disclosure under Rule 26 of Dr. Vance's additional opinion as to asbestos exposure caused by GE marine turbines was neither substantially justified nor harmless. The appropriate sanction is exclusion of Dr. Vance's testimony on this point from the case.

***2. Content and Admissibility***

GE has further argued that Dr. Vance's opinions as to GE products "are speculative, lack a sufficient factual basis, are not the product of reliable principles and methods reliably applied and thus, are not helpful to the trier of fact." (Def. GE's Mot. 1.) Hence, GE contends they are inadmissible under Federal Rule of Evidence 702, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

As to the facts or data underlying Dr. Vance's opinion on GE wire exposing Arbogast to asbestos, the Court concludes they are insufficient to comply with Rule 702. This issue has two parts: whether the GE wire used by or near Arbogast contained asbestos and, if so, whether the asbestos was released into the air breathed by Arbogast. The Court need not reach the second inquiry because the first part is not established by the evidence of record. Dr. Vance specifically cites Arbogast's testimony "that he worked with GE asbestos braided wiring" as the basis for concluding the GE wire contained asbestos. (Vance Op. 5.) Thus, the question arises as to the nature of the precise testimony of Arbogast and, in turn, its factual basis.

Relevant portions of Arbogast's *de bene esse* deposition follow:

> Q . . . with respect to the General Electric generators [that Arbogast encountered at Sparrows Point Shipyard], please describe your work, if any, in testing that wiring or cabling.
>
> A Just opening up the pot heads and checking the connections. If we thought they were right, then we just closed—closed them back up and—and went to the next particular piece of equipment.
>
> . . .
>
> Q Looking back today, do you believe that any of the wiring or cabling used on those ships contained asbestos?
>
> MR. TADDEO: Objection. Foundation. Assumes facts not in evidence. Leading. Calls for expert testimony.
>
> . . .
>
> A . . . Looking back, it would be a high-temperature use on the boiler systems. I—I don't think that the other wire—I'm not even sure if the other wire contained asbestos or not. I do believe that it was in the high-temperature systems on the boiler, though . . .

Q Sitting here today, do you—are you able to identify the brand name, tradename, or manufacturer's name of the electrical wiring or cabling associated with the . . . high-temperature boiler area?

. . .

A . . . it was General Electric equipment, most of it, or just about all of it, it was General Electric wiring that they—they used throughout the ship.

Q What did the appearance of wiring, which you believe was General Electric, look like? Can you describe that for us?

A The one around the—the high temperature, I think would have been the braided. The rest of it, I—is just regular cable with like a neoprene covering.

Q What color was the braided material you are referring to?

A A blackish color, blackish, dark gray color.

Q Did you have occasion to personally touch or handle any of that braided cabling while performing your work?

A Probably touching it, you know, when I opened the—the control—or the pot heads or the connection boxes that it fed on the—on the boilers and the different alarm systems, touching it. I did not have to take it apart or anything, just look at the connections. Maybe if something wasn't right, then I might break a connection inside the system itself and change it, you know, if we didn't think it was right.

Q Did your work ever involve cutting or stripping any of the wiring or cabling in high-temperature areas?

MR. TADDEO: Objection. Leading. Assumes facts. Compound question.

THE WITNESS: Not that I really recall, sir.

(Arbogast Dep. Apr. 8, 2015, 67:12—72:16.) It is this portion of Arbogast's testimony that Dr. Vance cites as the basis for his opinion that Arbogast was exposed to asbestos from GE wire. (*See* Vance Op. 5 n.14, citing page 71 of Arbogast Deposition, April 8, 2015.)[3]

---

[3] It is also noted that Arbogast testified about using GE wiring that he believed contained asbestos at the Mount Clare Shops of the B&O Railroad. (Arbogast Dep. Apr. 8, 2015, 131:14—138:16.) However, his testimony

In the Court's view, and as it relates to the issue at hand, all that Arbogast testified to in this part of his *de bene esse* deposition were (1) the wiring used throughout the ship was GE brand and (2) Arbogast believed it contained asbestos. Believing something contains asbestos—with no basis in the record for that belief—is not the same as knowledge that something contains asbestos. Since Arbogast cannot be said to have known the GE wiring contained asbestos, Dr. Vance certainly cannot rely on Arbogast's unsubstantiated belief that it did. As a result, Dr. Vance's opinion that Arbogast was exposed to asbestos by GE wire is not "based on sufficient facts or data," in contravention of what Rule 702 requires.

In their opposition to GE's motion, Plaintiffs point out that Dr. Vance "personally interviewed" Arbogast, as he mentioned in his October 22, 2015, deposition. (Pls.' Opp'n 3-4.) The wording of Dr. Vance's opinion indicates that it is based, in part, on what Arbogast told Dr. Vance in an informal conversation: "*He advised me* that this wiring produced visible dust when he worked with it . . . ." In his October 22, 2015, deposition, Dr. Vance confirmed he had an off-the-record conversation with Arbogast on July 24, 2015 (Vance Dep. Oct. 22, 2015, 24:6-13; 31:3-21), and said, "When he actually spoke to me personally, he said the wires were braided with asbestos covering to protect from heat." (*Id.* 114:15-17.) Aside from the objectionable hearsay nature of this testimony, the Court concludes it is still deficient as a basis for Dr. Vance's opinion since it merely relies upon Arbogast's unfounded belief that GE wire contained asbestos.

In addition, Dr. Vance admitted in his October 22, 2015, deposition that he had no knowledge regarding the asbestos content of GE wire or what type of asbestos, if any, was in GE wire; that he had not seen any GE documents that discuss asbestos and wire; that he had not seen

---

on that point is irrelevant because the particular usage of GE wiring he described was "an integral or essential part of locomotives," and the Court previously ruled that such could not be the proper basis for a claim. (Ord., Dec. 21, 2015, ECF No. 407.)

any documents from any source showing asbestos was in some kinds of GE wire during the time relevant to this case; that he had not seen any GE specifications or documents that stated asbestos was present in certain kinds of GE wire; and that, other than Arbogast's statement about GE wire, he had not seen any evidence that GE supplied any asbestos-containing wire to any of Arbogast's places of employment. (Vance Dep. Sept. 25, 2015, 108:13—110:12.) Dr. Vance also conceded he had not seen any published literature of expected exposure levels from working with asbestos-containing wire or any published literature connecting asbestos-related disease with asbestos-containing wire. (*Id.* 120:23—121:10.) These admissions add further support to the Court's conclusion that Dr. Vance's opinion regarding GE wire does not rest on sufficient facts or data to qualify for admission under Rule 702.

Even though the Court has excluded Dr. Vance's opinion as to asbestos exposure caused by GE marine turbines for noncompliance with Rule 26, the Court would still find Dr. Vance's belated, informal opinion on this product to be inadmissible under Rule 702 for the same reason as his opinion on GE wire. It is unsupported by evidence that GE actually included asbestos in its marine turbines; neither Arbogast's nor Dr. Vance's say-so is sufficient basis for his opinion.

***B. Summary Judgment***

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be

denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

Plaintiffs' claims arise under Maryland law. The governing standard in Maryland for liability in an asbestos case is that an actor's negligent conduct is a legal cause of harm to a plaintiff if the actor's conduct was a substantial factor in bringing about the harm. *Eagle-Picher v. Balbos*, 604 A.2d 445, 460 (Md. 1992). The *Balbos* case adopted a "frequency, regularity, proximity" test in determining whether particular conduct qualifies as a substantial factor. *Id.* This determination

> involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Id.*

This standard necessarily assumes its application to a product shown to have contained asbestos. But the threshold showing that a product actually contains asbestos cannot be

assumed; thus, it is an element of Plaintiffs' case for which they bear the burden of proof. Plaintiffs must offer evidence from which a jury may reasonably infer the asbestos content of a product. *See Rotondo v. Keene Corp.*, 956 F.2d 436, 439 (3d Cir. 1992) ("a plaintiff must present evidence 'to show that he inhaled asbestos fibers shed by the specific manufacturer's product'"), *quoted in Balbos,* 604 A.2d at 461.

Based upon earlier motions practice in the case, GE posits its understanding of Plaintiffs' claims against it as being limited to Arbogast's exposure to asbestos allegedly caused by (1) wire manufactured by GE and thermal insulation manufactured and applied by third parties to GE's marine turbines while working at Sparrows Point Shipyard in the approximate time frame of October 1962 to October 1963 and (2) wire, electrical control panels, grid resistors, and circuit breakers manufactured by GE while Arbogast was employed as an electrician at CSX's Curtis Bay Yard from 1973 to 1999. (Def. GE's Mot. Supp. Mem. 2, ECF No. 465.) GE's understanding is logical given Plaintiffs' response to GE's prior motion for partial summary judgment. (ECF No. 402-1.) That response can be fairly construed as indicating the universe of GE products for which Plaintiffs were making claims was limited to those "products at non-railroad facility jobsites and . . . at railroad jobsites for all products that are not related to locomotives or locomotive equipment" (*id.* 10); further, Plaintiffs' response indicated the sources of exposure as "Sparrows Point Shipyard (November 1962 to October 1963)" and "Curtis Bay Coal & Ore Piers (1974 to late 1970's)" (*id.* 3, 12).

However, in Plaintiffs' opposition to GE's motion for summary judgment, they expand the universe considerably by indicating their claims are based upon (1) GE motors, wiring, auxiliary generators, the main generator, and the drive motor aboard the *USS Sagamore* (on which Arbogast served from 1959 to 1962); (2) GE engines and steam turbines, control panels,

panel cabinets, wiring, motors, main propulsion turbines, main reduction and turning gear, cargo air conditioning compressor turbines, refrigerating compressor turbines, turbogenerator sets, main and emergency switchboards, controllers, emergency diesel generators, pallet handling system, cargo elevators, under-deck bridge cranes, and traveling gantry cranes at Sparrows Point Shipyard; and (3) GE controls and wiring, grid resistors, circuit breakers, cabinets for large breakers, marine steam turbines, and arc chutes or arc shields in certain types of switchgear such as transformers and control panels at Curtis Bay Coal and Ore Piers jobsite. (Pls.' Opp'n 5-10.) Plaintiffs also make reference to GE "asbestos containing blankets and thermal insulation, [and] sheet gasket material products for use on ships." (*Id.* 4.) Plaintiffs evidently are not pursuing any claims against GE based upon GE products allegedly used in proximity to Arbogast while he was employed at the Mount Clare Shops of the railroad.

GE has addressed this much longer list of products in its reply. (ECF No. 510.) There, it rightly notes that Plaintiffs have often merely listed GE products existing at Arbogast's various jobsites without providing any evidence to establish either they contained asbestos or that Arbogast was exposed to asbestos emanating from them.

As to Arbogast's time aboard the *USS Sagamore*, Plaintiffs point to certain excerpts from his depositions to support their claim against GE. (Pls.' Opp'n 5-6.) When explaining that he regularly did repairs in the engine and boiler room, Arbogast said,

> If a small motor went out, then we had to replace it with -- out of the -- out of our storeroom. If we pull a motor out, if it was a pump motor, then we had to break it from the pump, say, on the boilers. We would change the gaskets in the pump, between the pumps and the motors and hook it back up. And those pumps, those motors on the boilers would be the asbestos wiring for heat, you know, because it was a small auxiliary boiler. But it supplied the heat to -- throughout the ship.

(Arbogast Dep. Apr. 1, 2015, 135:10-19.)

He indicated he had done major work inside the motors approximately four times. (*Id.* 143:20.) The frequency of his work with the leads or wires was, he guessed, "quite a few times on different motors" over a period of three years. (*Id.* 151:9-10.) Arbogast also described the wire used on the motors:

> That was like a fuzzier coating inside the -- if you stripped it back, it was a fuzzier coating around the wire itself to keep it from burning up from the high temperatures.

(*Id.* 153:10-13.) He described the wire as having a copper conductor core covered by a plastic coating, wrapped in something braided, covered in a rubberlike coating, and then covered with a metal woven material. (*Id.* 153:14—155:18.) The "something braided" part of the wire, Arbogast said, was "asbestos, like a grayish material." (*Id.* 154:4.) When asked why he thought the "something braided" was asbestos, Arbogast replied, "It's just I think, you know, that that was the name we called it, the asbestos wiring, you know." (*Id.* 158:2-4.) He also indicated the small motors he had described were GE or Delco motors. (*Id.* 169:6-12.)

None of what Plaintiffs cite—nor any portion of this deposition they do not cite—supports a reasonable inference that the GE products Arbogast encountered aboard the ship actually contained asbestos. Certainly, Arbogast said the wire he described was referred to as "asbestos wiring" by him and by others with whom he worked. But that casual reference is not proof of asbestos content. Moreover, Plaintiffs have not pointed to any evidence that what Arbogast called "asbestos wiring" on board the ship was made by GE. The Court cannot assume either asbestos content or identify of manufacturer. In addition, he never testified about any asbestos in the small motors with which he worked aboard the ship.

GE has provided evidence that its Wire and Cable Business Division "was engaged in the manufacture of electrical wire and cable products, a small percentage of which contained

encapsulated chrysotile." (Interrog. Ans. 6 at p. 54, ECF No. 465-4.) This encapsulated chrysotile-containing, insulated wire or cable had certain specialized uses, but was generally used when the wire was expected to withstand elevated temperatures. (*Id.* at p. 55.) GE describes this kind of wire as "consist[ing] of one or more metallic conductors, usually copper, a layer of insulation containing chrysotile fully encapsulated in an elastomeric or resin binding agent, a filler, and an outer sheath or covering, the composition of which depended upon the application. The wire and cable had a braided surface or an elastomeric or felted jacket, impregnated with various materials in order to create a smooth, homogeneous appearance in a variety of colors." (*Id.*) This description is somewhat different from Arbogast's description. Notably, Arbogast describes "fuzzy" braiding material, whereas GE describes "a layer of insulation containing chrysotile fully encapsulated in an elastomeric or resin binding agent," which would seem not to be "fuzzy." Additionally, to GE's knowledge and belief, GE stopped selling shipboard cable for use on Navy ships in the early to mid-1950s. (*Id.*) Finally, GE stated in its answers to interrogatories, "[d]ue to the encapsulation of the chrysotile fibers, . . . the use, installation and removal of such chrysotile-containing wire and cable products would not be expected to cause the release of asbestos fibers in any quantity significant to human health." (*Id.* at p. 56.) Plaintiffs have cited to no evidence in the record to the contrary, nor is it likely they could do so in light of Dr. Vance's concessions in his deposition testimony to the effect that he knew of no studies relating to electrical wire and asbestos exposure.

Without any evidence to permit a reasonable inference that Arbogast was frequently and regularly in close proximity to any asbestos-containing GE product on board the *USS Sagamore*, that portion of Plaintiffs' claim fails.

As to Arbogast's employment at the Sparrows Point Shipyard, Plaintiffs have not directed the Court's attention to any evidence from which a jury could draw a reasonable inference that Arbogast encountered at the shipyard any GE products actually containing asbestos. They again appear to rely upon Arbogast's *ipse dixit* to prove GE products contained asbestos. (Pls.' Opp'n 4 (quoting Plaintiffs' Answers to Defendants' Master Set of Interrogatories).) They make one reference to Arbogast's *de bene esse* deposition in which he "described that one of the trades at the shipyard were laggers, who would put insulation on the steamlines throughout the ship, starting at the boiler." (*Id.* 8 (citing Arbogast Dep. Apr. 8, 2015, 49:16-20).) Presumably, the steamlines were connected to turbines, but Plaintiffs have provided no proof that the steamlines were a GE product; further, the Court can only presume, but cannot reasonably infer, that the insulation contained asbestos. Plaintiffs also provide some evidence that some GE products may well have contained asbestos at various times (Pls.' Opp'n Ex. 52, 53, & 54), but contrary to Plaintiffs' argument (Pls.' Opp'n 11-12), the specifications relating to removable insulated covers for large steam turbines allowed, but did not require, the use of asbestos-containing material for them (*see* Ex. 54). Further, GE has said that whether insulation was applied at all to large steam turbines was a decision to be made by the purchaser. (Ex. 53 at p. 63.) Plaintiffs fail to show that any particular GE products, containing asbestos, were used in regular proximity to Arbogast such that he would have met the Maryland standard for determining actionable exposure to asbestos. Consequently, this portion of Plaintiff's claim against GE fails.

Plaintiffs' evidence as to Arbogast's alleged asbestos exposure caused by GE products at the Curtis Bay Coal and Piers jobsite is similarly deficient. Plaintiffs have not directed the Court's attention to any evidence allowing a reasonable inference that the particular GE products

encountered by Arbogast at that location contained asbestos. They point to evidence that Arbogast was sometimes around dust (Pls.' Opp'n 10-11), but they cannot establish that the dust was caused by asbestos in GE products.

### ***III. Conclusion***

The Court concludes that Dr. Vance's opinions as to Arbogast's exposure to asbestos being caused by GE products are properly excluded. In addition, the evidence before the Court fails to create a genuine dispute of material fact, and GE is entitled to judgment as a matter of law on all of Plaintiffs' claims against it. A separate order will issue.

DATED this 18th day of May, 2016.

BY THE COURT:

/s/

James K. Bredar
United States District Judge