## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| **CHARLES LEMUEL ARBOGAST, JR.,** *et al.,* | * |
| **Plaintiffs** | * |
| **v.** | * |
| **A.W. CHESTERTON CO.** *et al.,* | * |
| **Defendants** | * |

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*

**CIVIL NO.  JKB-14-4049**

### <u>MEMORANDUM</u>

The Court has previously ruled on certain motions in this personal injury case premised upon exposure to asbestos.  The Court now addresses the following motions for summary judgment:

- ECF No. 444 – Eaton Corporation ("Cutler Hammer")

- ECF No. 448 – Foster Wheeler Energy Corporation & Foster Wheeler LLC

- ECF No. 452 – MCIC, Incorporated

- ECF No. 461 – Georgia-Pacific LLC

- ECF No. 462 – Crane Company

- ECF No. 464 – Schneider Electric USA, Incorporated ("Square D")

- ECF No. 466 – Crane Company

- ECF No. 467 – Union Carbide Corporation

- ECF No. 470 – Crane Company

No hearing is necessary.  Local Rule 105.6 (D. Md. 2016).

*I. Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

*II. Analysis*

The Plaintiffs in this case are Charles Lemuel Arbogast, Jr. ("Arbogast"), and Barbara Arbogast. They sued over two dozen manufacturers and/or distributors/installers of products that allegedly contained asbestos, which allegedly was released into the air breathed by Arbogast and which allegedly caused his mesothelioma. Because the complaint was broad in its allegations of

2

liability—with no allegations specifically directed at any particular product—the case turns on

the evidence relating to specific products by specific manufacturers, or distributors or installers

of specific products.

Plaintiffs have proceeded on both negligence and strict liability theories against

Defendants.  Both theories include an element of causation.  In Maryland, causation of injury in

an asbestos exposure case is established if the actor's conduct was a substantial factor in bringing

about the claimed harm to the Plaintiffs.  *Eagle-Picher v. Balbos*, 604 A.2d 445, 460 (Md. 1992).

In *Balbos*, the Maryland Court of Appeals adopted a "frequency, regularity, proximity" test in

determining whether particular conduct qualifies as a substantial factor.  *Id.*  This determination

> involves the interrelationship between the use of a defendant's product at the
> workplace and the activities of the plaintiff at the workplace.  This requires an
> understanding of the physical characteristics of the workplace and of the
> relationship between the activities of the direct users of the product and the
> bystander plaintiff.  Within that context, the factors to be evaluated include the
> nature of the product, the frequency of its use, the proximity, in distance and in
> time, of a plaintiff to the use of a product, and the regularity of the exposure of
> that plaintiff to the use of that product.

*Id.*

The essential components of this causation test, as distilled from Maryland case law and

case law from the Fourth Circuit, include the following:  (1) the specific product, attributable to a

specific defendant, contained asbestos; (2) the product was used in such a way that it released

respirable asbestos fibers into the air breathed by the plaintiff; and (3) the plaintiff encountered

the respirable asbestos fibers from a specific product with such frequency and regularity and in

such proximity to the product that a factfinder may reasonably infer the specific product was a

substantial factor in bringing about (4) the claimed physical injury.  *See Balbos*, *id.*  *See also*

*Reiter v. Pneumo Abex, LLC*, 8 A.3d 725, 732 (Md. 2010) (plaintiffs must present evidence of

exposure to specific product made or manufactured by defendant "'on a regular basis, over some

extended period of time, in proximity to where the [plaintiff] actually worked'" (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986) (emphasis omitted))); *Georgia-Pacific Corp. v. Pransky*, 800 A.2d 722, 724-25 (Md. 2002) ("the plaintiff must have been in or very near the presence of the asbestos-containing product and able to inhale fibers released from that product"); *Rotondo v. Keene Corp.*, 956 F.2d 436, 439 (3d Cir. 1992) ("a plaintiff must present evidence 'to show that he inhaled asbestos fibers shed by the specific manufacturer's product,'" *quoted in Balbos*, 604 A.2d at 461).

Besides proving causation, Plaintiffs bear the burden of proof on the other elements of a particular theory of liability. Thus, liability also must be premised either upon a failure to perform a duty in a negligence case, *B.N. v. K.K.*, 538 A.2d 1175, 1178 (Md. 1988), or, in a strict liability case, upon a product defect that existed when the product left the defendant's control, that renders the product unreasonably dangerous, and that was foreseeably present when encountered by the consumer, *Phipps v. Gen. Motors Corp.*, 363 A.2d 955, 963 (1976). A product defect may include the failure to warn the consumer of the product's dangerous nature. *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 639 (Md. 1992). In asbestos cases, whether sounding in negligence or strict liability, a defendant may be liable for failure to perform this duty to warn users or bystanders of the danger of asbestos exposure. *May v. Air & Liquid Sys. Corp.*, 129 A.3d 984, 1000 (Md. 2015).

When considering a motion for summary judgment, if the Court finds a complete failure of proof on an essential element of a plaintiff's case, then no genuine dispute of material fact exists, and the defendant is entitled to judgment as a matter of law. *Catrett*, 477 U.S. at 322-23. The Court now turns to each of the Defendants' pending motions.

### A. *Eaton Corporation ("Cutler Hammer") (ECF No. 444)*

Eaton Corporation is the successor in interest to Cutler Hammer, Inc.  Plaintiffs allege Arbogast was exposed to asbestos from Cutler Hammer products.  According to Plaintiffs' response in opposition to Cutler Hammer's motion, Arbogast's work as an electrician exposed him to Cutler Hammer lighting panels at Sparrows Point Shipyard from 1962 to 1963, Cutler Hammer motor controllers and arc chutes at the Mount Clare Shops for the B&O Railroad from 1963 to 1973, and Cutler Hammer grid resistors, controllers, and lighting circuit breakers at Curtis Bay Coal & Ore Piers (also part of B&O Railroad) starting in 1973.  (Pls.' Opp'n 4-8, ECF No. 501.)  Notably, Plaintiffs have failed to narrow their allegations to *specific* products. Instead, they have referred to categories of products.  More is required.  Although the Court is not mandating Plaintiffs produce a specific product name and number (even though that would be helpful), they must at least provide a sufficiently specific description of a particular product in order for a Defendant to be able to search its records and locate whatever information it has on that product so that the Defendant can defend itself from Plaintiffs' allegations, which as previously noted, were worded generally in the complaint.  Mere reliance upon a brand name such as "Cutler Hammer" is insufficient.

In addition, none of the evidence cited by Plaintiffs in their opposition provides more than a scintilla of evidence, if that, of the asbestos content of Cutler Hammer products.  Arbogast testified in deposition that he could not recall whether any lighting panels he worked with at Sparrows Point contained asbestos.  (Pls.' Opp'n Ex. 3, Arbogast Dep. Apr. 1, 2015, 240:10-12, ECF No. 502.)  He also testified he believed the arc chutes contained asbestos "[b]ecause of the high heat that they were protecting."  (*Id.* Ex. 4, Arbogast Dep. Apr. 2, 2015, 359:20—360:2.) Further, he testified he believed he was exposed to asbestos from "the wiring and stuff on the bridge resistors [at Curtis Bay] . . . [a]nd that particular wiring would get heated and turn like a

5

whitish color and frayed sometimes." (*Id.* 397:13—398:10.)  Also, he believed Cutler Hammer

lighting circuit breakers "did have maybe some asbestos properties in it, but I am not sure. . . . I

mean, they were made out of, like, a Bakelite material.  I am not sure if that was the Bakelite, the

breakers itself.  Later, I understood that Bakelite did have some asbestos properties in some of

the Bakelite." (*Id.* 553:21—554:9.)  Finally, Plaintiffs extract the following statements from

Cutler Hammer's answers to interrogatories in a prior case:

> ... brand name and trade name of all products was "Cutler Hammer" and the
> types, descriptions, composition and dates are as follows:  (1) arc shield/chute
> component—sold ... 1940 [to] ... the early 1980's. . . . The . . . composition is
> unknown but any asbestos material was believed to be chrysotile of unknown
> percentage .... , (2) ebony panel board component—sold ... late 1930's [to] ... early
> 1980's. . . . The ... composition is unknown but any asbestos was believed to be
> chrysotile of unknown percentage .... "

(*Id.* Ex. 61, *Bartlett v. 20th Century Glove Corp. of Texas*, No. 03-C-9600, 04-C-115, Cir. Ct.

Kanawha Cty., W. Va., *quoted in* Pls.' Opp'n 8.)

Plaintiffs have failed to adduce any evidence to support Arbogast's bare beliefs that he

personally was exposed to asbestos emanating from any *specific* Cutler Hammer product.  That

*some* Cutler Hammer products *may* have had asbestos in them simply is not enough evidence to

create a genuine dispute of material fact in the instant case.  Consequently, Plaintiffs have failed

to present evidence that would allow a jury to find they have carried their burden of proof on an

essential element of their case against Cutler Hammer, and summary judgment shall be granted

to this Defendant.

### B. Foster Wheeler Energy Corporation & Foster Wheeler LLC ("Foster Wheeler") (ECF No. 448)

In their opposition to Foster Wheeler's motion for summary judgment, Plaintiffs contend

that while he was employed at Sparrows Point Shipyard, Arbogast "was exposed to asbestos-

containing internal components and external asbestos-containing thermal insulation necessary to

meet the design requirements of [Foster Wheeler's] marine boilers. . . . Foster Wheeler designed

and manufactured marine boilers that, by necessity, contained asbestos components and required

asbestos thermal insulation on the exterior.  This was essential to the proper functioning of the

Defendant's boilers due to the high heat applications."  (Pls.' Opp'n 3-4, ECF No. 498.)

Plaintiffs have not cited to one shred of evidence to support these bold statements.

Plaintiffs rely upon a recent Maryland Court of Appeals decision, *May v. Air & Liquid*

*Sys. Corp.*, 129 A.3d 984 (Md. 2015), for the proposition that Foster Wheeler owed a duty of

care to Arbogast "even if the asbestos used in and around its boilers was manufactured by a third

party."  (Pls.' Opp'n 10.)  For the moment, the Court will assume that asbestos manufactured by

third parties was installed by third parties in or around the Foster Wheeler boilers, although the

record is somewhat lacking on this point.  Even so, while certainly expanding a potential basis

for negligence and strict liability beyond the confines of prior Maryland law holding no duty

existed if the defendant did not manufacture or supply the asbestos product, the *May* decision

nevertheless carefully limited that potential liability to the circumstances present in that case:

> This Court concludes that a manufacturer will have a duty to warn under
> negligence and strict liability when (1) its product contains asbestos components,
> and no safer material is available; (2) asbestos is a critical part of the pump sold
> by the manufacturer; (3) periodic maintenance involving handling asbestos
> gaskets and packing is required; and (4) the manufacturer knows or should know
> the risks from exposure to asbestos.

129 A.3d at 1000.  Thus, the court recognized "that narrow circumstances exist where a

manufacturer can be liable for products it has not touched."  *Id.*

Plaintiffs have cited to no evidence showing that the Foster Wheeler marine boilers at

issue here "contain[ed] asbestos components, and no safer material [was] available," that

"asbestos [was] a critical part of the [marine boilers] sold by the manufacturer," or that "periodic

maintenance involving handling asbestos gaskets and packing [was] required."   Assuming

*arguendo* Plaintiffs could supply evidence on the fourth element of the *May* test, the Court cannot see any factual basis for applying the rest of that test to the instant case. The *May* court stressed that a third party's asbestos must be crucial to the proper functioning of the original manufacturer's equipment before liability may be imposed on that manufacturer for injury resulting from use of the third party's asbestos in conjunction with the equipment. *Id.* at 992. With no evidence that the Foster Wheeler marine boilers *required* asbestos in order to function, Plaintiffs cannot stretch *May* far enough to help them. The Court concludes Plaintiffs have failed to make a showing on an essential element of their case against Foster Wheeler; therefore, summary judgment will be granted to these Defendants.

### C.  *MCIC, Incorporated (ECF No. 452)*

Plaintiffs have referred to MCIC, Incorporated, as the successor to McCormick Asbestos Company (Compl. (caption); Pls.' Opp'n 4, ECF No. 499), and MCIC has not controverted that reference. In their deposition testimony, Arbogast and his coworker Maurice Burnham testified that while they were employed at the Mount Clare Shops of the B&O Railroad, they sometimes saw "McCormick Asbestos Company" trucks on the premises and McCormick's employees working in various buildings. (Pls.' Opp'n Ex. 1, Arbogast Dep. Apr. 8, 2015, 94:9—95:8; Ex. 11, Burnham Dep. July 15, 2015, 62:11-16.) Arbogast testified that the Mount Clare Shops were heated by steam radiators connected via pipes to boilers. (Arbogast Dep. Apr. 8, 2015, 84:20—86:6.) The steam lines were covered in a two-piece material placed around the pipe, with a cloth covering over that; the joints would be cut to fit the pipe, and a cement "mud" was applied to keep all of it in place. (*Id.* 88:16—89:1.) The two-piece insulation was white and came in approximately three-foot lengths in boxes bearing the name "Kaylo." (*Id.* 89:10-19.)

The insulation was referred to as "lagging." (*Id.* 90:21.) Arbogast said he would be called by the shop superintendent to where the laggers were working to provide lighting for them

while they were installing the pipe lagging.  (*Id.* 90:18—91:6.)  He also changed lightbulbs and repaired electrical equipment in all of the various buildings.  (*Id.* 83:3-6.)  Arbogast would also repair the boiler alarm systems when they malfunctioned, and he said "[t]hat happened a lot of times when the asbestos company came in there and were doing their work."  (*Id.* 91:18—92:4.) At least a couple of times every year, Arbogast saw pipe laggers come in and repair the lagging on the boiler; they would be there for three or four days, maybe a week, at the time.  (*Id.* 93:5-7; 102:6-10.)  They also worked in the other railroad shop buildings, and they would come in every couple of months for this purpose.  (*Id.* 93:15—94:5.)  The laggers would use saws to cut the lagging (*id.* 95:21—96:2); they would dump out the dry cement from forty or fifty-pound bags and use water and a mortar hoe to mix up the "mud" (*id.* 96:14—97:19).  Dust was generated from the cutting of the Kaylo and the mixing of the mud.  (*Id.* 99:20—100:5.)  In a deposition, Arbogast described the distance he was from the pipe laggers as "maybe the size of this room" (*id.* 101:6-7), but no one at that deposition approximated for the record "the size of this room." The Court can only speculate that the deposition was held in a conference room of indeterminate size.  Arbogast testified he first observed the McCormick pipe laggers working at the Mount Clare Shops in 1965.  (*Id.* 109:1-6.)  He indicated that when he went to a shop to install lighting or perform other tasks at the same time the pipe laggers were working, he would be there for twenty or thirty minutes.  (Pls.' Opp'n Ex. 4, Arbogast Dep. Apr. 2, 2015, 457:17-21.)  However, he was not able to say how many times he went into a shop when the pipe lagging was in progress.  (*Id.* 457:11-16.)

Burnham confirmed the frequency of McCormick's visits to the Mount Clare Shops for boiler insulation repairs as about two times a year.  (Burnham Dep. 60:15-16; 62:11-16.)  He also said that he and Arbogast were sometimes present when another employee was cleaning up after the pipe laggers left and that they breathed the dust generated by the sweeping done by that

employee.  (*Id.* 74:1—76:3.)  Plaintiffs have also directed the Court's attention to a brochure for Kaylo; the brochure states that asbestos is included in Kaylo's composition.  (Pls.' Opp'n Ex. 15.)

The Court concludes that Arbogast has produced sufficient evidence from which a factfinder could reasonably infer that McCormick's use of Kaylo at the Mount Clare Shops exposed Arbogast to asbestos.  It is not at all clear, though, that Arbogast will be able to satisfy the "frequency, regularity, and proximity" test to establish causation.  Nevertheless, enough evidence exists to generate a jury question on this point.  As a result, MCIC's motion for summary judgment will be denied.

### D. *Georgia-Pacific LLC (ECF No. 461)*

Georgia-Pacific's motion for summary judgment is limited to Plaintiffs' strict liability claims and is further limited to a question of law.  Georgia-Pacific presents the question of whether the manufacturer of an asbestos-containing product can be held liable under a theory of strict liability when the product was sold no later than 1973 and Maryland did not recognize a cause of action of strict liability until 1976.  The resolution of this question does not affect Plaintiffs' negligence claim against Georgia-Pacific.

Georgia-Pacific's argument is that strict liability for dangerous products did not exist in Maryland until the Maryland Court of Appeals held in *Phipps v. Gen. Motors Corp.*, 363 A.2d 955 (1976), that a manufacturer could be held liable if a product was in a defective condition, thereby rendering it "not reasonably safe," when it left the defendant's control.  *Id.* at 956, 963. Various Maryland cases have voiced the proposition that, ordinarily, changes in common law principles applicable to actions sounding in tort are applied to the litigants in the case before it and prospectively to causes accruing after the date of the case in which the change is announced. *See, e.g., Kelley v. R.G. Industries, Inc.*, 497 A.2d 1143, 1161-62 (Md. 1985), *abrogated by*

10

*statute, now codified as* Md. Code Ann., Pub. Safety § 5-402(b) (LexisNexis 2011) (formerly, Md. Ann. Code art. 27, § 36-I(h)).   Going even further in the *Kelley* case, which announced a new cause of action in strict liability by gunshot victims against manufacturers and marketers of "Saturday Night Specials" (cheap handguns often used in street crimes), the court observed that its holding there would be applied only in cases in which the initial marketing of a Saturday Night Special occurred after the date of the mandate in *Kelley*.   *Id.* at 1162.    That ruling overrode the usual rule of applying changes in tort law prospectively to cases *accruing* after the court opinion announcing the modification.

Plaintiffs' case accrued in 2014 when Arbogast was first diagnosed with mesothelioma. *See Georgia-Pacific v. Benjamin*, 904 A.2d 511, 515 (Md. 2006) (applying "discovery rule" to cases involving workplace exposure to toxic substances, like asbestos). But, relying upon the *Kelley* case, Georgia-Pacific contends it would be unfair to permit Plaintiffs to pursue a theory of strict liability against it since its Ready-Mix joint compound was sold to Arbogast in the early 1970s, before *Phipps* was decided, leaving Georgia-Pacific with no opportunity to purchase insurance or take other measures to spread its risk of loss attributable to future strict liability for its products.

The Court finds no merit in Georgia-Pacific's argument.   The *Kelley* rule seems to be applicable only to that case.   Notably, the *Kelley* court observed that, until that case was decided, manufacturers and marketers of handguns would "have had little reason to anticipate that their actions might result in tort liability."   497 A.2d at 1162.   Manufacturers of asbestos-containing products, however, stand on different ground.   Although *Phipps* may have been the first case in Maryland to apply a strict liability theory in a tort case, that development was hardly unforeseen.

As early as 1958, the Maryland Court of Appeals set forth fairly expansive principles of negligence law applicable to a seller or other supplier of chattel when harm occurs "to the person

11

or property of a person who may be expected to be in the vicinity of the chattel's probable use if he has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied." *Babylon v. Scruton*, 138 A.2d 375, 377 (Md. 1958). Further, the *Babylon* court quoted from a treatise:

> "The maker of an article for sale or use by others must use reasonable care and skill in designing it and in providing specifications for it so that it is reasonably safe for the purposes for which it is intended, and for other uses which are foreseeably probable. And a person who undertakes such manufacturing will be held to the skill of an expert in that business and to an expert's knowledge of the arts, materials, and processes. Thus he must keep reasonably abreast of scientific knowledge and discoveries touching his product and of techniques and devices used by practical men in his trade. He may also be required to make tests to determine the propensities and dangers of his product."

*Id.* at 378 (quoting 2 Harper & James, *The Law of Torts* § 28.4).

"The doctrine of strict liability is really but another form of negligence *per se*, in that it is a judicial determination that placing a defective product on the market which is unreasonably dangerous to a user or consumer is itself a negligent act sufficient to impose liability on the seller." *Phipps*, 363 A.2d at 962. Thus, as the *Phipps* court stated, "the theory of strict liability is not a radical departure from traditional tort concepts." *Id.* at 963. Consequently, the court joined "[a]lmost all of the courts of [Maryland's] sister states" in adopting strict liability principles. *Id.*

Later, in an asbestos case, the court addressed the scope of strict liability applicable to a seller's failure to warn of the dangerous nature of its product. First, it reiterated the elements of strict liability, adopted from Section 402A of the Restatement (Second) of Torts:

> "(1) [that] the product was in a defective condition at the time it left the possession or control of the seller,
>
> (2) that it was unreasonably dangerous to the user or consumer,
>
> (3) that the defect was a cause of the injuries, and

12

(4) that the product was expected to and did reach the consumer without substantial change in its condition."

*Phipps*, 363 A.2d at 958, *quoted in Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 638-39 (Md. 1992) (applying strict liability theory to case arising from asbestos exposure in 1940s, 1950s, and 1960s).  Then, the *Zenobia* court held Comment j of Section 402A applicable to a strict liability cause of action in which the defect alleged is a failure to give adequate warnings.  Comment j indicates the "seller is not strictly liable for failure to warn unless the seller has 'knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the . . . danger.'"  *Zenobia*, 601 A.2d at 641.  Additionally, the court opined that the "should have knowledge" component of Comment j is equivalent to holding a manufacturer of a product to the knowledge of an expert in the field, relying upon the portion of the Harper & James treatise quoted in the 1958 case of *Babylon*.  *Id.*  Thus, the court recognized that "in a failure to warn case governed by the Restatement § 402A and Comment j, negligence concepts to some extent have been grafted onto strict liability."  *Id.* at 640.

The foreseeability of the applicability to asbestos cases of strict liability in the modified form set forth in Maryland case law is contrasted with what the *Kelley* court noted was the lack of foreseeability pertaining to a completely new cause of action against manufacturers and marketers of Saturday Night Specials where none had existed before; indeed, based on *Kelley*'s lack of citation to a similar case, no other jurisdiction had theretofore judicially created the cause of action announced in *Kelley*.  The *Kelley* court relied upon that lack of foreseeability to rule that its holding in that case would not depend upon the usual accrual principle in applying a change of the common law to new cases.  No such compelling circumstance arises in the present case, and the Court will apply to it the accrual rule for applicability of the strict liability theory, first officially recognized in Maryland law in 1976.  Under the accrual rule, the cause of action

did not arise until 2014.  Plaintiffs, therefore, may pursue their theory of strict liability in this case.[1]  Georgia-Pacific's motion for summary judgment as to strict liability will be denied.

### E.  *Schneider Electric USA, Incorporated ("Square D") (ECF No. 464)*

Schneider Electric USA, Incorporated ("Square D"), is the corporate entity with responsibility for Square D products.  Square D has moved for summary judgment as to all of Plaintiffs' claims against it, contending a failure of proof by Plaintiffs on the elements of their claim.  Having reviewed the pertinent portions of the record, the Court concurs with that contention.  Plaintiffs' case against Square D suffers from the same infirmities as did their case against Cutler Hammer.

In Plaintiffs' opposition, they indicate Arbogast was exposed to Square D lighting panels at Sparrows Point Shipyard, Square D motor controllers and arc chutes at the Mount Clare Shops of B&O Railroad, Square D lighting circuit breakers at Curtis Bay Coal and Ore Piers, and a Square D breaker box that he installed in his home during a renovation project.  (Pls.' Opp'n 4-7.)  Assuming for the moment that Plaintiffs have sufficient evidence to place Arbogast in some proximity to Square D products, the Court nevertheless notes here, too, Plaintiffs refer to categories of products and not specific products.  "Square D makes literally thousands of different products," according to Rodney J. West, a Square D representative who was deposed in another asbestos case.  (Pls.' Opp'n, Ex. 56, West Dep. 20:17-18, Oct. 9, 2012, *Dean v. ACandS, Inc.*, Cir. Ct. Balt. City, No. 24X10000167.)  Plaintiffs have the burden to establish that Arbogast was exposed to *specific* Square D products, and they have not carried that burden.  Their evidence of asbestos content is equally deficient.  It consists in part of Arbogast's "belief" that

---

[1]   In the end, it may not make much difference in the proof required under the strict liability count versus the proof required under the negligence count.  With both counts depending heavily upon an alleged failure to warn, the result obtained may be quite similar, if not identical, as between the two counts.

some Square D products contained asbestos.  (Arbogast Dep. 360:1-6, Apr. 2, 2015; *id.* 553:21—

554:1.)  Plaintiffs also refer to Square D's answer to Plaintiffs' Interrogatory No. 2:

> . . . to the best of its present knowledge, Square D products which may have incorporated molded or bonded component parts manufactured from composite materials which could have contained some quantity of encapsulated asbestos, were generally not qualified under the relevant military specifications during the relevant time period.  Square D does not believe that its products were suitable for installation and use aboard US Navy warships during the relevant time period.  By way of further response, Square D sold its products primarily through distributors or original equipment manufacturers.   Thus, at the present time, Square D is generally unaware as to the specific identity of entities or persons to whom its products were ultimately sold, at which job sites they may have been delivered or used, when those sales took place or where they were eventually placed into service.  Moreover, at the present time, Square D is generally unable to ascertain specifically to whom its products were sold during time periods when certain of its products may have included molded or bonded component parts manufactured from composite materials which could have contained some quantity of encapsulated asbestos.  Square D states that at the present time, and in the absence of additional information, Square D is generally unable to ascertain when, where, or to whom certain Square D electrical equipment products were supplied to or placed into service.

(Pls.' Opp'n, Ex. 57 at p. 7.)

> In Square D's response to Plaintiffs' Interrogatory No. 8, Square D stated as follows:

> . . . to the best of its present knowledge, Square D generally did not specify that suppliers of composite materials use asbestos. Instead, Square D generally required that materials used to make component parts of its electrical equipment products meet certain physical and performance specifications.   Additionally, Square D states that to the best of its knowledge, information regarding the specific chemical composition and ingredients of such molded or bonded materials utilized in Square D electrical equipment products would be in the possession of the suppliers of those materials and not necessarily with Square D. To the best of its present knowledge, the following may have supplied materials to Square D for use in the manufacture or assembly of molded or bonded component parts in certain electrical equipment products which may or may not have contained asbestos:  . . . Union Carbide Corporation [and] General Electric . . . .

(*Id.* at pp. 21-22.)

Finally, Plaintiffs point to a document referring to "Molding Material Spec.," bearing

Square D's corporate name and dated November 19, 1971.  (*Id.* Ex. 58.)  The document refers to

"Union Carbide BMRS 5314 B10" and in the "remarks" section it says "Dust Free Modified Fibre Granular 2 Step Material."  Plaintiffs then quote an excerpt from a notice published by the Environmental Protection Agency in the Federal Register on February 13, 1990:

> General Purpose Bakelite contained less than 12% asbestos content ... [and] was marketed for use in certain electrical devices such as electrical panels, electrical plug receptacles, and electric switches. General Purpose Bakelite consisted of the following Bakelite product designations ... BMRS 5314 ....

(Pls.' Opp'n, Ex. 25.)

Plaintiffs utterly fail to connect "Union Carbide BMRS 5314" with a specific Square D product encountered by Arbogast.  Plaintiffs' evidence, at best, suggests that some Square D products may have contained asbestos.  But that is insufficient under governing standards to establish the essential elements of Plaintiffs' case against Square D and to survive summary judgment.[2]  Accordingly, Square D's motion will be granted.

### F.  Union Carbide Corporation (ECF No. 467)

Plaintiffs' claims against Union Carbide focus on "Bakelite" and "Calidria."  Plaintiffs contend that Arbogast's exposure to asbestos in these products was a substantial factor in causing his mesothelioma.  (Pls.' Opp'n 5-6, ECF No. 496.)  Their proof falls short.

According to Plaintiffs, "'Bakelite' was a brand name product with a registered trademark and *was manufactured by UCC and used as a panel board in high voltage electrical control boxes at Plaintiff's job sites*."  (*Id.* 6 (emphasis added).)  They have provided no citation to evidence in support of the latter part of this statement.  Indeed, they rely upon a document from the United States Patent and Trademark Office as to Union Carbide's trademark of a

---

[2]  The Court notes that Plaintiffs contend they "will also offer expert testimony showing that Plaintiff's exposures to Square D's products, which were repaired, cleaned, and worked on both by Mr. Arbogast directly and in his proximity, released asbestos fibers above background levels . . . ."  (Pls.' Opp'n 23.)  They then refer to a medical doctor's report (Ex. 22), which makes no mention of Square D products, and "reliance materials" (Ex. 23.1 *et seq.*).  (*See* Pls.' Opp'n 23-24.)  The latter are comprised of many hundreds of pages; the undersigned will not comb through those many pages in search of evidence to support Plaintiffs' contention.

product called "Bakelite" (Pls.' Opp'n Ex. 16, ECF No. 502-11), but apparently ignore important statements in this document. Near the beginning of the document, it indicates the "Bakelite" trademark is granted for "molding compounds and mixtures adapted for the manufacture of the following electrical commodities or parts thereof and for such electrical commodities or parts made of said compounds and mixtures," and then it includes a lengthy list of different types of "electrical commodities or parts thereof" for which "Bakelite" may be used. (*Id.* at p. 41 of 69 (using the ECF page numbers).) At the very end of the document, it says, "The trade-mark is applied to the goods or to packages containing the same by means of printed labels on which the trade-mark is shown; or by molding or impressing the mark in the molded goods." (*Id.* at p. 43 of 69.) Thus, "Bakelite" refers to the substances from which are made specific "electrical commodities or parts thereof" and things made from Union Carbide's Bakelite compounds and mixtures, but the document does not support Plaintiffs' inference that Union Carbide actually manufactured the end products containing Bakelite.

In another asbestos case, an affidavit by a corporate representative for Union Carbide stated the following:

> 2.      Between approximately 1939 and the late 1980s, Union Carbide sold phenolic resins under the trade name bakelite. The phenolic resins were made from phenol and formaldehyde. Union Carbide's phenolic resins did not contain any fillers and *never* contained asbestos. Union Carbide's phenolic resins were sold in liquid or powder form.

> 3.      From approximately 1939 until approximately 1975, Union Carbide also sold phenolic molding compounds under the trade name bakelite. Until approximately 1974, *some* of Union Carbide's phenolic molding compounds contained asbestos as a filler. Many of these phenolic molding compounds *did not* use asbestos fillers but instead used other materials, *e.g.*, wood flour, cotton flock, mica, and/or coal. Union Carbide's phenolic molding compounds were sold in granular form.

> 4.      Union Carbide never manufactured finished products from its phenolic resins or phenolic molding compounds. For example, Union Carbide never

17

manufactured and sold finished products used for electrical insulation from its phenolic resins or molding compounds.

5.      Although bakelite was once a trade name for Union Carbide's phenolic material (both resins and molding compounds), Union Carbide also later used it as a trade name for other plastic materials that it produced.  Bakelite also became a generic name for all products made from phenolic resins or phenolic molding compounds, regardless of the manufacturer of the raw material.  Bakelite is used as a generic term in the plastics industry in much the same way Kleenex is used to describe all facial tissue.

(Def. Union Carbide's Mot. Summ. J., Ex. F, Carrington Aff., Mar. 11, 2013, *DeLisle v. A.W. Chesterton Co.*, No. 12-25722(27), Cir. Ct. Broward Cty., Fla., ECF No. 467-2.)

Union Carbide also provides an expert's report that provides evidence of the later-acquired generic nature of the term "Bakelite" or "bakelite."  (*Id.* Ex. G, Expert Report, Dr. John E. Moalli, ECF No. 467-3.)  The evidence is taken from various publications indicating members of the manufacturing industry as well as members of the public interchangeably used the term regardless of whether the particular substance was Union Carbide's product or another manufacturer's product.  (*Id.* Sec. 2.0.)  Additional support for the notion that "bakelite" does not necessarily indicate a Union Carbide product comes from Plaintiffs' own expert, Dr. Vance, who readily acknowledged that he uses it as a generic term.  (Pls.' Opp'n, Ex. 7, Vance Dep. 139:3—140:8, Sept. 25, 2015, ECF No. 502-7.)  Moreover, both Arbogast and his coworker, Burnham, testified they could not identify the manufacturer of the material to which they referred as "Bakelite."  (Def. Union Carbide Mot. Summ. J., Ex. C, Arbogast Dep. 612:14-18, Apr. 7, 2015, ECF No. 467-2; Ex. E, Burnham Dep. 83:15—84:5, ECF No. 467-2.)  Finally, Arbogast never testified that he saw any "Bakelite" trademark on any material used in his work.

Not only are Plaintiffs unable to show that anything Arbogast called "Bakelite" was in fact a Union Carbide product, but they are also unable to establish that whatever they called by that term actually had asbestos content.  As noted earlier as to other Defendants' products,

Arbogast "believed" Bakelite contained asbestos, but that belief is unsupported by any objective evidence. He states unequivocally that "the Bakelite[ ] components contained asbestos fiber" (Arbogast Dep. 87:4-5, Apr. 1, 2015), but fails to explain how it is that he can distinguish asbestos fibers from nonasbestos fibers. Although the evidence shows some formulations of Union Carbide's Bakelite contained asbestos, no proof exists that those formulations were in the products with which Arbogast worked. Any inference he worked with asbestos-containing Bakelite, made with Union Carbide's molding compounds and mixtures, is based on sheer speculation. Consequently, Plaintiffs have failed to make a showing of an essential element on this part of their claim against Union Carbide.

Calidria was the product name given to a specific kind of asbestos fiber sold by Union Carbide to various manufacturers and producers who used Calidria in their products or production processes; Union Carbide did not itself manufacture the end products in which Calidria may have been used. (Pls.' Opp'n, Ex. 19, Union Carbide's Ans. to Interrog. 6, *In re. New York City Asbestos Litigation*, No. NYCAL 88/40,000, Sup. Ct. New York City, ECF No. 502-11.) In October 1968, Union Carbide published an informational brochure that suggested Calidria Asbestos SG-130 and SG-210 were well suited for tape joint compound formulations.[3] (*Id.* Ex. 20, "Calidria Asbestos," ECF No. 502-11.) The brochure appears to have manufacturers as its target audience.[4]

Plaintiffs state, with no record citation, "Throughout the period of 1970 to July 1973, UCC was the exclusive asbestos fiber supplier to Georgia-Pacific and the manufacturer of Gold

---

[3] In another exhibit, "SG" appears to be a shorthand notation for "Standard Grade." (*See* Pls.' Opp'n, Ex. 28.)

[4] Plaintiffs also cite to a "Material Safety Data Sheet," dated August 31, 1984, in which Union Carbide acknowledges health hazards of asbestos exposure. (Pls.' Opp'n, Ex. 26, ECF No. 502-21.) This document seems irrelevant to Plaintiffs' claim based on Calidria since Arbogast's exposure to it, if at all, occurred in the early 1970s.

Bond (National Gypsum) joint compound products." (Pls.' Opp'n 12.) The Court notes that, while Georgia-Pacific is a party in this case, National Gypsum is not. Taking the latter Defendant first, the Court does not see before it competent evidence as to the composition of Gold Bond joint compound. Plaintiffs have cited to "National Gypsum Company's Responses to Plaintiffs' First Set of Interrogatories to All Defendants," showing a date of October 30, 1985, in the case of *Rockovich v. Flintkote Co., Inc. & et al.*, Nos. G.D. 84-21577 & 84-21492, Ct. Com. Pleas, Allegheny Cty., Pa. (Pls.' Opp'n, Ex. 36, ECF No. 502-23.) However, Plaintiffs have failed to authenticate this document excerpt (it is not even signed) and have failed to show that Union Carbide was a party to that case and, therefore, that it would have had an opportunity in that case to take discovery against National Gypsum. In short, Plaintiffs have failed to show how any document attributable to National Gypsum should be admitted into evidence against Union Carbide in this case.[5] Moreover, the document does not support the contention that Union Carbide was the exclusive asbestos fiber supplier for National Gypsum's Gold Bond joint compound products. Finally, it does not shed light on the composition of the particular Gold Bond joint compound purchased and used by Arbogast.

As to Georgia-Pacific, Plaintiffs have copies of invoices from Union Carbide to Georgia-Pacific for shipments of SG-210 to Georgia-Pacific's Akron, New York, plant and Milford, Virginia, plant from January 27, 1970, to June 29, 1973. (Pls.' Opp'n, Ex. 28, ECF No. 502-21.) Nevertheless, these invoices do not prove that Union Carbide was the exclusive supplier of asbestos to Georgia-Pacific during that period of time. More to the point, they do not prove that

---

[5] Union Carbide's objection to Plaintiffs' use of this document is meritorious. *See* Advisory Committee Notes to Fed. R. Civ. P. 56(c), 2010 Amendment (objection pursuant to subsection (c)(2) "functions much as an objection at trial, adjusted for the pretrial setting"); *see also Capitol Radiology, LLC v. Sandy Spring Bank*, Civ. No. DKC-09-1262, 2010 U.S. Dist. LEXIS 13725, at *8-9, 11-12 (D. Md. Feb. 17, 2010) (answers to interrogatories must be based on personal knowledge). Given that the excerpt is unsigned, the Court has no way of knowing on whose personal knowledge the answers are based. But the more significant problem is that they cannot be considered binding upon Union Carbide.

those SG-210 fibers wound up in the Georgia-Pacific Ready Mix joint compound used by Arbogast.

Plaintiffs cite an excerpt from the February 13, 1990, Federal Register, Volume 55, Number 30, in which the Environmental Protection Agency ("EPA") published summaries of information submitted to it by various manufacturers pursuant to the Asbestos Information Act of 1988. (Pls.' Opp'n 16, ECF No. 496.) As to Georgia-Pacific, it stated that its "wet mixed joint compound" was manufactured from 1963 to 1977 and listed the following components: "approximately 1.5 to 5% asbestos; 45 to 70% calcium carbonate (limestone); or 45 to 70% calcium sulfate (gypsum); 5 to 10% mica; 2 to 5% vinyl binder(s); and 30 to 40% water." (*Id.*, Ex. 25 at 5150.) This summary only speaks of "asbestos," not specifically Union Carbide's Calidria. As to the latter, Union Carbide submitted information to the EPA indicating Calidria was produced from 1963 to 1985 (*id.* at 5157), but that information does not connect Calidria to Georgia-Pacific.

To establish causation as to Union Carbide's Calidria, Plaintiffs rely upon the formulas for Georgia-Pacific products and the testimony of William Lehnert, who retired in 1990 as the manager of Georgia-Pacific's Product Development and Technical Service Department. (Pls.' Opp'n, Ex. 29, Lehnert Dep. 9:23-24, 10:3-4, 11:4-6, Oct. 3, 2001, *All Asbestos Litigation Filed by the Simmons Firm, L.L.C. v. Georgia-Pacific et al.*, 3d Jud. Cir., Madison Cty., Ill., ECF No. 502-22.) In that job, Lehnert was responsible for formulation of joint system compounds, which were used to tape and finish the joints on gypsum wallboard and to conceal the dimpled nail heads and the corner beads in gypsum wallboard construction. (*Id.* 13:1-10, 13:24-25, 14:21—15:1, 15:21-23, 17:15-9.) Prior to his deposition, Lehnert reviewed the different formulas of Georgia-Pacific's Ready Mix joint compound and other products that were formulated for the various manufacturing plants and drew up a handwritten chart that

summarized generally the time frames and the plants in which certain Georgia-Pacific products incorporated Union Carbide's Calidria, designated as SG-210. (*Id.* Lehnert Dep. Ex. B.) The record does not include a summary chart of Georgia-Pacific product formulas that did not incorporate Calidria.

Georgia-Pacific had manufacturing plants in different parts of the country. According to Lehnert, the plant in Acme, Texas, supplied joint compounds for the southwestern part of the United States; the Akron, New York, plant could have supplied them for the northeastern part of the United States; the Chicago plant would have furnished them in the Midwest; the Marietta, Georgia, plant would supply them in the southeastern United States; and the Milford, Virginia, plant "supplied in between Akron and Marietta . . . [m]aybe the east central part of the United States." (*Id.* 29:10—30:10.) When asked whether there would have been "inter-regional moving of product," Lehnert said, "That could happen and I'm sure it did at times." (*Id.* 58:11-16.) When asked in a later deposition "if a specific product was sought and it was not manufactured in the nearest plant, . . . would [it] come from the next nearest plant?," Lehnert responded, "That's a marketing question, and I really don't know." (Pls.' Opp'n, Ex. 33, Lehnert Dep. 59:20-25, Oct. 14, 2003, *Szabo v. Bondex Int'l, Inc.*, No. GN-203244, 126th Jud. Cir., Dist. Ct., Travis Cty., Tex., ECF No. 502-23.) Lehnert did not know of any instance where Ready Mix would have been shipped to a different region. (Pls.' Opp'n, Ex. 29, Lehnert Dep. 98:25-99:1, Oct. 3, 2001.) Additionally, he did not know what quantity of product was made from any particular formula. (*Id.* 100:9-12.) Notably, his testimony indicated that Union Carbide was not the only supplier of asbestos to Georgia-Pacific. (*Id.* 26:15-17.)

Another former Georgia-Pacific employee "with working knowledge of the distribution centers" in the Baltimore area, Howard A. Schutte, testified that the two plants providing Ready Mix joint compound to the Baltimore area were Akron, New York, from 1965 up until mid-1973

and then Milford, Virginia, from mid-1973 onward when that plant "came online." (Def. Union Carbide's Reply, Ex. A, Schutte Dep. 19:3-13, 28:13—29:7, Mar. 22, 2013, *Burke v. ACandS, Inc.*, No. 24X110000780, Balt. City Cir. Ct., ECF No. 512-1.) Product formulas varied from plant to plant; thus, to know what was in a particular bucket of joint compound in a particular area of the country at a specific time, one must look at the formulas for the particular plant serving that area within the specific time frame. (*Id.* 60:8-16.) As to Ready Mix joint compound, a given plant might have more than one formula to make that product over time. (*Id.* 61:4-9.) To know which formulas contained SG-210 requires examination of the formulas themselves. (*Id.* 60:11-16, 61:16-20; Lehnert Dep. 97:18-21, Oct. 3, 2001.)

Generally, SG-210 was used in Georgia-Pacific joint compound products from December 29, 1969, to May 4, 1977. (*Id.* 28:22—29:2.) According to Lehnert's handwritten summary chart, Ready Mix was produced in the Akron plant from December 29, 1969, to May 4, 1977, and 1.25% to 2.0% of the compound was comprised of SG-210. (Lehnert Dep. Oct. 3, 2001, Dep. Ex. B.) Lehnert's chart also noted as to Akron, "Virtually all formulas up to 9/70 used 7RF-9 asbestos.[6] From 9/70 forward all available formulas used some SG-210 *except for asbestos free*." (*Id.* (emphasis added).) The Milford plant produced Ready Mix from June 21, 1973, "to at least" January 20, 1975, with SG-210 being 1.25% to 1.6% of the compound. (*Id.*) Lehnert further noted, "All general formulas from 6/73 to 1/75 had SG-210. *No SG-210 in topping, crack resistant formula, buff taping, and asbestos free*." (*Id.* (emphasis added).) He clarified that the percentage referred to percentage by weight. (*Id.* 89:22-24.) Lehnert did not testify in the 2001 deposition about specific formulas. Nor did he do so in the 2003 deposition or the 2006 deposition.

---

[6] 7RF-9 was identified as asbestos from the Philip Carey Corporation. (*Id.* 84:20-24.)

The individual formulas for Georgia-Pacific Ready Mix are the heart of Plaintiffs' case against Union Carbide with respect to Calidria. This is the point at which their proof fails.

In his 2001 deposition, Lehnert estimated the total number of Georgia-Pacific product formulas as 300 or more. (*Id.* Ex. 29, 92:16-17.) Plaintiffs have provided a subset of those, consisting of 36 product formulas (Pls.' Opp'n, Ex. 31 & 31.1). Based on Lehnert's and Schutte's deposition testimony, it is reasonable to conclude that any Ready Mix sold to Arbogast in the Baltimore area came from Akron—if before mid-1973—or from Milford—if after mid-1973. Thus, any of the 36 formulas provided to the Court by Plaintiffs and not from either Akron or Milford can be ignored, leaving 18 formulas for Plaintiffs to use in their effort to prove that Union Carbide's Calidria, or SG-210, was in the Ready Mix used by Arbogast on his home renovations.

Three of the Akron formulas are for "Bedding Compound AK-937," but Plaintiffs have not claimed that Arbogast was exposed to a bedding compound containing Union Carbide's Calidria, so these may be excluded. As well, the two Akron formulas for "All-Purpose Joint Compound AK-935" may be excluded inasmuch as the All-Purpose product was sold in dry form and had to be mixed with water (Lehnert Dep. 44:4—45:2, Oct. 3, 2001); Arbogast testified that he bought an already mixed, wet product (Arbogast Dep. 806:1-19, Apr. 7, 2015). The remaining Akron formulas are all denoted as "Ready Mix Filler AK-978 (Filler "X")." (*See* Ex. 31.1.) These are described, on the formula sheet, as "Filler for Ready Mix Joint Compound AK-979," or "Filler for Ready Mix Joint Compound AK-979 and AK-977." Plaintiffs do not supply the formulas for Ready Mix Joint Compound AK-979 or AK-977. But Union Carbide has supplied the formula for "Ready Mix Joint Compound AK-979 (Hand Tools)," which the formula sheet indicates is "Supplied on special request only." (Def. Union Carbide's Reply, Ex. B, ECF No. 512-1.) Schutte testified that, unless a customer specified a "special request"

formula, then he would be provided with the generally available formula.[7]  (Schutte Dep. 72:10—73:13.)  He also testified that generally available Ready Mix joint compound containing SG-210 was first manufactured at Akron after April 4, 1974 (*id.* 75:6-17), and any Ready Mix joint compound containing SG-210 manufactured at Akron before that date would have been a special request formula (*id.* 75:18—76:1).  Plaintiffs have not supplied the Akron formula for generally available Ready Mix joint compound during the relevant time period, and the Court cannot speculate on its content.[8]  Consequently, all of the Akron formulas provided to the Court by Plaintiffs must be excluded from consideration.

After excluding the formulas for plants other than Milford, that leaves three formulas for the Court's consideration.  Those are all designated as "Ready Mix Joint Compound V-977 (Machine Tools)," and the earliest formula in that trio is dated June 21, 1973.  (Pls. Opp'n, Ex. 31 at 83-85 (using ECF page numbers), ECF No. 502-22.)  Schutte testified that a formula could be designated for machine tools or hand tools; if it was marked as "machine tools," then that would indicate it was to be used with specially designed tools that carried a reservoir of joint compound.  (Schutte Dep. 80:21—81:12.)  Arbogast testified he used hand tools to apply the joint compound.  (Arbogast Dep. 771:7—773:8, Apr. 7, 2015.)  Plaintiffs have not provided Milford formulas for generally available Ready Mix joint compound, to be used with hand tools, for the relevant time frame.  Once again, the Court cannot speculate as to that particular

---

[7] Since Arbogast did not provide evidence that he requested a special formula, the Court infers he purchased a generally available formulation of Ready Mix.

[8] Lehnert acknowledged one would need to consult the formulas to know what was manufactured at a particular plant at a particular time.  The Court has reviewed the formulas provided by Plaintiffs and found those formulas do not support Lehnert's summary chart, which did not distinguish between special request formulas and generally available formulas for Ready Mix joint compound manufactured at Akron.  Perhaps other formulas exist, but the Court has no way of knowing which formulas were consulted by Lehnert.  The Court can only rely upon the evidence of record in determining whether a genuine dispute of material fact exists.

formula's content.  And nothing in the record establishes whether Arbogast bought an asbestos-free Ready Mix joint compound or whether he bought one containing SG-210.

Assuming *arguendo* that the generally available Ready Mix for use with hand tools manufactured at Milford contained SG-210 after June 21, 1973, Plaintiffs have the burden of showing Arbogast purchased Milford-made Ready Mix when it was available for sale to the public after that date.  They have not done so.  No evidence has been provided as to when after June 21, 1973, Milford-made Ready Mix (assuming it contained SG-210) was distributed from the Milford plant to Baltimore-area stores and available for sale to walk-in customers.  It is unrealistic to think that sequence of events occurred before Arbogast purchased the Ready Mix he was using to finish the addition on his house. Arbogast indicated he was working hard to have the home renovation project finished before Plaintiffs' youngest child came home from the hospital; that child was born on July 20, 1973.  (Arbogast Dep. 218:1-6, Apr. 8, 2015.)  Arbogast testified his wife was about seven months pregnant when she was helping him put the Sheetrock up in the new addition.  (*Id.* 220:3-6.)  He estimated they spent some evenings and some of the weekends, over a period of three to four weeks, to hang the drywall.  (Arbogast Dep. 767:15—768:6, Apr. 7, 2015.)   Arbogast then used drywall tape and joint compound to finish the Sheetrock; that work entailed putting a layer of joint compound over the seams, then following that with tape, then applying more joint compound, then sanding it to smooth it, and then perhaps applying another coat of joint compound and sanding that.  (*Id.* 220:15—221:8.)  He estimated he spent some evenings and some of the weekends, over a period of about a month, to finish the Sheetrock (*id.* 774:4-13).  He only recalled using the Georgia-Pacific Ready Mix on the addition to the Arbogasts' home, estimating he used "maybe a can" of the joint compound that came in a five-gallon bucket (*id.* 793:10—795:4; 808:21—809:17), and he was "more or less" finished with that part of the renovation project by the time their new baby came home from the hospital

(*id.* 810:6-18).  Viewing his testimony in the light most favorable to Plaintiffs, one can infer he

bought the can of Georgia-Pacific Ready Mix and began the Sheetrock finishing work shortly

before the Milford plant started manufacturing the joint compound.  Regardless, any inference

that Arbogast was exposed to Union Carbide's Calidria from using Georgia-Pacific Ready Mix

rests upon speculation.

No genuine dispute of material fact exists on Plaintiffs' claim involving Bakelite or

Calidria, and Union Carbide's motion for summary judgment will be granted.

### G. Crane Company

Crane has filed three motions:

- Motion for Summary Judgment as to All Direct Claims, Cross-Claims, and Third-Party Claims (ECF No. 462)

- Motion for Partial Summary Judgment on All Claims Relating to Exposure to Asbestos-Containing Products Crane Co. Neither Manufactured nor Supplied (ECF No. 466) and

- Motion for Partial Summary Judgment (ECF No. 470)

In addition to the all-inclusive first motion, both it and the second motion discuss the

issue of third-party manufactured or supplied asbestos products and whether Crane is liable for

them.  The third motion is limited to the question of whether Defendant Goodyear Tire & Rubber

Company was the exclusive manufacturer of Cranite sheet gasket or packing material during the

years of Arbogast's alleged exposure to it.  After reviewing the evidence, the Court concludes

that Crane is entitled to summary judgment on all of Plaintiffs' claims against it.  As a result,

Crane's motion for partial summary judgment as to Goodyear is moot; likewise, Goodyear's

motion (ECF No. 519) for leave to file supplemental opposition or a surreply to Crane's motion

is also moot.

In Plaintiffs' response in opposition to Crane's motions, Plaintiffs unhelpfully make numerous statements without citations to evidence in the record. Although their response is not entirely clear, it seems as if Plaintiffs complain about Arbogast being exposed to asbestos by being around, using, and/or working on Cranite sheet gasketing material and Crane valves.

As to Cranite, Crane said in discovery answers in another case that "[m]aterial called Cranite was manufactured exclusive for resale by Crane Co., during the relevant time period through what appears to be the early-to-mid 1970s." (Pls.' Opp'n, Ex. 47, Ans. to Interrog. at p. 16, *In re. New York City Asbestos Litigation* ("NYCAL"), Sup. Ct. New York City, No. 40,000/88, ECF No. 502-25 (no date given).) Presuming "the relevant time period" is concurrent with the relevant time period in the instant case, the Court also notes the following from Crane's discovery responses: "Cranite 'sheet packing' was comprised of 75%-85% chrysotile asbestos, the balance consisting of a natural rubber binder and inert fillers. Cranite 'sheet packing' was sold in sheet and pre-cut gasket form. Any asbestos contained in Cranite, however, was chemically and physically bound within a rubber-like compound that prevented the release of any friable asbestos fibers." (*Id.* p. 17.) Plaintiffs have pointed to no evidence that contradicts this statement. Arbogast testified that Cranite sheets came in rolls in two different thicknesses, one "maybe a 16th" of an inch, and the other "close to an eighth of an inch thick." (Arbogast Dep. 21:11-18, Apr. 8, 2015.) If Cranite was cut, that process made "a little dust." (*Id.* 24:10.)

Plaintiffs also provide some pages from an undated document appearing to be marketing material. (*Id.* Ex. 48, "Crane Valves, Fittings, Pipe, and Fabricated Piping," ECF No. 502-25.) In that document, it is stated, "Cranite is a packing for severe service, such as superheated steam, dry air, acids, oils, ammonia, alkali, gases, etc. Cranite gaskets are used on all Crane valves for high pressure, saturated or superheated steam." (*Id.* p. 363.) Plaintiffs also provide copies of another document, "Crane Valves," bearing a copyright date of 1960. (*Id.* Ex. 49, ECF

No. 502-25.)  This document shows drawings and product descriptions for various Crane-made gaskets, but no descriptions for any valves.  The gaskets vary in composition; they include cloth-inserted rubber, "CC" rubber, Cranite, and metal.  (*Id.* pp. 321-23.)

Since Arbogast testified he recalled seeing the brand name "Cranite" during the course of his employment, the Court infers he was exposed to Cranite and that Cranite contained asbestos, albeit not respirable asbestos.  The causation test requires exposure to respirable asbestos fibers, not simply exposure to a product containing asbestos.  Plaintiffs have not directed the Court's attention to any evidence showing Arbogast's exposure to respirable asbestos fibers emanating from Cranite.  Thus, Plaintiffs fail to meet a necessary element of their case as to Cranite.

A careful review of Plaintiffs' opposition indicates that their contentions pertaining to Crane valves relate to internal gaskets and packing material made from Cranite that had to be replaced from time to time.  Consequently, it seems that they are not alleging any other characteristic of Crane valves is at issue.  According to the earlier-cited answers to interrogatories in the NYCAL cases, certain Crane valves included "internal asbestos-containing gaskets, packing, or discs. . . . Any components that may have been enclosed within the metal structure of Crane Co. valves did not emit friable or respirable asbestos fibers while enclosed within that structure. . . . [A]ny asbestos contained in the components, themselves, was chemically and physically bound within the component itself by a rubber-like compound." (NYCAL Ans. to Interrog. p. 12.)  What has already been concluded by the Court as to Cranite applies to Crane valves.  Plaintiffs have not pointed to any evidence that any work on Crane valves by Arbogast or anyone around him resulted in the release into the air of respirable asbestos fibers.  To the extent Plaintiffs are suggesting Crane valves were fitted, originally or otherwise, with gaskets, packing material, etc., manufactured by others than Crane, they have

also failed to show that Crane required asbestos replacements.  *See May*, 129 A.3d at 992, 1000. Crane is entitled to summary judgment as a matter of law.

### III.  Conclusion

With the exception of the motions for summary judgment filed by MCIC and Georgia-Pacific, Crane's motion for summary judgment against Goodyear, Crane's motion for summary judgment as to third-party asbestos, and Goodyear's motion for leave to file supplemental opposition or a surreply, all pending motions will be granted by separate order. The former two motions will be denied, and the latter three are moot.

DATED this 25th day of July, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge